930 So.2d 1039 (2006)
STATE of Louisiana
v.
Richard J. HEBERT.
No. 05-KA-1004.
Court of Appeal of Louisiana, Fifth Circuit.
April 25, 2006.
*1042 Paul D. Connick, Jr. District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Kia M. Habisreitinger, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, SUSAN M. CHEHARDY and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, Judge.
The defendant, Richard Hebert, was found guilty of attempted second degree *1043 murder after a bench trial, and was sentenced to ten years at hard labor without benefit of parole, probation or suspension of sentence. The defendant now appeals his conviction and sentence.

FACTS
On September 7, 2002, Stacey Burd sustained a stab wound to his chest causing injuries to his diaphragm, liver, and lung that required surgery. At trial, the State presented evidence that the defendant stabbed Burd with a knife through the eyewitness testimony of Burd and Ramona Arceneaux. The defendant testified that Burd was the aggressor, and that he did not intend to kill him.
Stacey Burd, the victim, testified that he knew the defendant, Richard J. Hebert, prior to September 7, 2002, for a short period of time. He met Ramona Arceneaux twice. On September 7, 2002, Burd received a paycheck of between $340 and $360, and then visited the defendant, at his house in Jefferson Parish. According to Burd, the defendant was aware that he had cashed his paycheck, because he told him he had and that he had the money on his person. Burd and the defendant shot darts and drank beers, at the defendant's house. They attempted and failed to buy marijuana in St. Rose, then returned to the defendant's house, shot some more darts, and drank some more beer. Burd testified that he was not intoxicated, and believed that the defendant was coherent and alert, not totally intoxicated. Subsequently, he drove the defendant and Arceneaux to a Circle K, located less than half a mile from the defendant's house, to buy some more beer. He went into the store to buy the beer. The defendant accompanied him into the store, but took a little time getting out of the car. On the trip back to the defendant's house, he drove with Arceneaux seated in the passenger seat and the defendant behind him, the same positions they were in on the trip to the Circle K. After they arrived at the house and he parked the car, the defendant asked Arceneaux, "What do you think, Ramona?" twice, back to back. Burd testified that when he looked at Ramona "her eyes were stretching and she was smiling, you know, like, but she wasn't moving, she was totally still." He thought she looked nervous, because she knew something was going to happen, but was afraid to say anything. Then, the defendant grabbed him around the throat with his left hand, and stabbed him in his chest muscle through his rib cage. He thought the defendant was trying to kill him and take his money. When he saw the butcher knife coming at him again, he caught it and pinned the defendant's hand to the roof, ripped his hand off his throat, and opened his door. As he exited the car, he pulled the defendant out, and then twisted the defendant's hand making him drop the knife, on the ground outside the car. The defendant got out and walked off with Arceneaux. Burd testified that he got back in his car and attempted to call 911, then the defendant turned around and walked toward his vehicle. As defendant approached, Burd put the car into reverse, backed out of the driveway, and called 911. At some point, he threw the butcher knife used by the defendant on the backseat of his car. He was unaware that there was another knife in his car. He remained at the scene, in his car, watching the apartment to make sure the defendant and Arceneaux did not leave, until the police arrived. When the police arrived, he told them where the defendant and Arceneaux were. He was later taken by ambulance to the hospital, and eventually to surgery for the stab wound that punctured his liver and scarred his lung.
Ramona Arceneaux testified that she entered into a deal with the State in which the State agreed to dismiss the attempted second degree murder charge and she *1044 agreed to plead guilty to attempted armed robbery, if she testified. Arceneaux testified that she knew the defendant, because he was her lover for two years and lived in the same apartment complex as her. She also knew Burd through her relationship with the defendant. She only had contact with Burd for a second time on the day of the incident. On the day of the incident, the defendant called her to come over to his apartment in Metairie. When she arrived, Burd and the defendant were there drinking beer. She brought a slab of crack cocaine for her and the defendant to smoke, but the defendant took her aside, into the bathroom, and told her not to say anything, because Burd only drank beer and smoked marijuana. As far as she knew, Burd did not know about the crack cocaine.
Later, after playing darts, she and the defendant went into the bathroom to smoke crack, without Burd's knowledge. While they were in the bathroom, the defendant told her that he wanted to rob and kill Burd. He told her he wanted the money because "he was financially broke `cause. . . he was on a 30-day crack roll," which meant, "he's been up for 30 days smoking crack." The defendant told her that he knew Burd had money, because Burd wanted him to buy him some marijuana. She refused, and the defendant told her to "go along" with the story or he would kill her. She testified that the defendant previously had beaten her and tried to kill her twice. However, she blew off his threat against Burd, because the defendant had threatened to kill her ex-boyfriends and never followed through with it. She did not think he "could even confront another man not [sic] much less try to kill one," after he had beaten her. Afterwards, she and the defendant returned to the front of the apartment where Burd was, and the defendant made some phone calls on Burd's cell phone, attempting to buy Burd some marijuana, but was unsuccessful. Then, according to Arceneaux, she and the defendant left with Burd pretending they were going to buy marijuana, but the defendant intended to buy crack with Burd's money. Burd was unaware of the plan. They parked in front of a closed corner store. She remained in the car drinking with Burd, while the defendant and the crack dealer were "gone for a good while." When the defendant came back, he handed Burd the money, and they went back to the defendant's apartment to play darts. On the last trip to get beer, Burd got out of the car and went into a convenience store, after the defendant told him that he wanted to kiss Arceneaux and tell her he loved her. According to Arceneaux, the defendant actually handed her two knives and told her to put them underneath the driver's seat mat, toward the back of the car. She took the knives and placed them under the mat, but toward the front of the car. She recognized the knives from the defendant's kitchen. After they arrived at the defendant's apartment, and Burd parked the car, she "hear[d] a knife com[ing] around the seat." Burd was stabbed. She continued to see the knife come in Burd's direction quite a few times. At some point during the incident, the defendant told her to hit Burd on the head with a bottle. She saw Burd fight for the knife, and eventually disarm the defendant. Burd told the defendant that he "couldn't believe what was happening," and to get out of his car. After the defendant got out, she saw "[the defendant] going back at [Burd] again" trying to get the knife. While Burd was calling 911 and fighting off the defendant, she left. She hid behind a boat across the street, because she feared for her own life. Later, Arceneaux testified that she called the defendant over and told him to take off his white T-shirt, because the police would see it in the dark. She claimed to have done this, because she was trying to find the *1045 knife she thought he had brought to stab her. Then, the defendant ripped her shirt and bra, and told her to tell the police that Burd attempted to rape her and that is why the defendant stabbed him. She testified that she only agreed to get the defendant to the police. Burd neither raped nor attempted to rape her. The police found her and the defendant in the apartment complex. She identified the defendant in court as the person she saw stab Burd.
Deputy Ricardo Ramos with the Jefferson Parish Sheriff's Office testified that when he responded to the scene of the stabbing in Metairie, he observed a black male holding his chest. The victim had blood coming out onto his shirt. He was suffering and in pain, because of the stab wound. The victim told him what happened earlier in the day and that, upon his return to the apartment complex, he was stabbed in the chest after which his friend and his friend's girlfriend left. The perpetrators were caught and brought back to the scene. Burd identified both Hebert and Arceneaux at the scene. He identified Richard Hebert, without hesitation and by name, as the person who stabbed him. He was one hundred percent positive. Hebert, the defendant, stated that he stabbed Burd, the victim, because he tried to rape Arceneaux. After the defendant and Arceneaux were separated, she stated that Burd had not tried to rape her, and that the defendant had tried to rob Burd. This was corroborated by a lack of evidence both from her and on her. Arceneaux's shirt and bra were ripped, but she did not have any physical marks on her consistent with being battered or held down. In her statement to the police, Arceneaux stated that they were all at the defendant's house. The defendant knew that Burd had a large amount of money, and he wanted to rob him. Arceneaux initially did not agree, but changed her mind after the defendant threatened to kill her. Later when they went out, she reluctantly hid the knives under the front seat. When they returned to the apartment complex parking lot, the defendant asked her twice what she thought, then took the knife and stabbed Burd. The defendant also told her to hit Burd on the head with a bottle.
Dr. Richard E. Deno, an emergency room physician at East Jefferson, testified that, as a result of the stab wound, Burd had blood in his chest, an injury to his diaphragm and his liver, and arterial bleeding in his lung that required surgery.
The defendant testified that he met Burd a month and a half before the incident. He claimed that he never used crack cocaine, and neither was he in a 30-day crack cocaine binge on the day of the incident. In addition, he did use crack cocaine with Arceneaux, in the bathroom, on the day of the incident. He testified that on the night of the incident Arceneaux was already at his apartment, because she had moved in the Sunday before. Later, Burd came over. He noticed that Burd and Arceneaux were whispering behind his back. Burd had already been drinking, and asked him for the first time to get him some marijuana. He called a friend, and they went to St. Rose to buy the marijuana. Burd gave him $60.00 to buy the marijuana. However, the dealer only had crack cocaine. He did not purchase any, but the dealer gave him a $5.00 piece of crack cocaine for Arceneaux, after seeing her in the car. When they returned to the apartment, Arceneaux went into the bathroom to use the crack cocaine. Later, he went into the bathroom to get her when he and Burd decided to go get more beer. After getting the beer, they returned to the apartment complex and remained in the car. Burd and Arceneaux started whispering to each other again. He asked Arceneaux what she thought was going on, and she looked uncomfortable. Then, he *1046 saw Burd reach down toward the passenger's seat near the floor where the defendant saw two knives. He instinctively grabbed the knife, and tried to put the knives on the seat beside him. When Burd grabbed his right wrist, it caused one of the knives to fall on the seat. As Burd pulled his right arm toward the front seat, he grabbed Burd by the throat with his left hand. In his struggle to get free, Burd was unintentionally stabbed. After Burd was stabbed, the knife was dropped. He got out of the car, because he was terrified. Burd called the police on his cell phone. Arceneaux ran to his apartment, and he went to her. When he got to his apartment, Arceneaux ripped her shirt and bra, and told him that she was going to tell the police that Burd tried to rape her. He found a set of keys that Arceneaux told him belonged to Burd. He attempted to return them, but Arceneaux grabbed them, threw them into a drain, and ran. He ran after her, and the police found them. He claimed that he had no need to rob Burd, because he cleared about $1800 per month in salary and his mother helped him financially.

ANALYSIS
In his first allegation of error, defendant challenges the sufficiency of evidence to sustain his conviction. He argues that the evidence was insufficient to establish that he intended to kill Burd. Rather, he claims that Burd was the aggressor. The State argues that the evidence proved the defendant stabbed Burd with the specific intent to kill based on the location of the wound, in the middle of his chest, and the extent and severity of his injuries.
The standard of review for determining the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Barnes, 98-932, p. 3 (La. App. 5 Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. The trier of fact can accept or reject, in whole or in part, the testimony of any witness. State v. Baker, 01-1397, (La.App. 5 Cir. 4/30/02), 816 So.2d 363, 365. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id.
Second degree murder is the killing of a human being when the offender has a specific intent to kill. LSA-R.S. 14:30.1 "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended." LSA-R.S. 14:27. To prove attempted second degree murder, the State must establish, beyond a reasonable doubt, that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. State v. Cepriano, 00-213, (La.App. 5 Cir. 8/29/00), 767 So.2d 893, 897. Specific intent to inflict great bodily harm is sufficient to support a murder conviction, but second degree attempted murder requires a specific *1047 intent to kill. Id. at 898. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1); Cepriano, 767 So.2d at 897. Specific intent to kill may be inferred from the extent and severity of the victim's injuries. State v. Stacker, 02-768, (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, writ denied, 03-0411 (La.10/10/03), 855 So.2d 327.
In the present case, the State proved that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. Burd testified that the defendant, who was known by him prior to the incident, grabbed him around the throat with his left hand, and stabbed him in his chest muscle through his rib cage. He thought the defendant was trying to kill him and take his money. When the defendant tried to attack him again with the butcher knife, he caught it and pinned the defendant's hand to the roof, ripped his hand off his throat, opened his door, and exited the car. He pulled the defendant out of the car while defendant was still holding the knife, and then twisted his hand to make him drop the knife. While he attempted to call 911, the defendant turned around and walked toward his vehicle forcing him to put the car into reverse, and back out of the driveway before calling 911.
Ramona Arceneaux testified that the defendant took her aside, into the bathroom, and told her that he wanted to rob and kill Burd. Later on a trip to get beer, the defendant actually handed her two knives and told her to put them underneath the driver's seat mat, toward the back of the car. After they arrived, at the defendant's apartment, she "hear[d] a knife com[ing] around the seat," when the defendant stabbed Burd. She saw Burd fight for the knife, and eventually disarm the defendant. After the defendant got out of the car, she saw him go back, fight with Burd and try to get the knife.
Dr. Richard E. Deno testified that, as a result of the stab wound, Burd had blood in his chest, an injury to his diaphragm and his liver, and arterial bleeding in his lung that required surgery. He opined that it took a considerable force for the knife to go through Burd's rib cage. The force required would be "a considerable effort by a strong man and somebody that's fighting with them [sic] to actually go through a rib cage." He noted that it was not uncommon for a bullet to be deflected by the rib cage.
The trial court found Arceneaux's testimony, which was corroborated by Burd's testimony, to be more credible than the testimony of the defendant. The evidence adduced supports the defendant's conviction for attempted second degree murder. Compare State v. Zaldivas, 02-0690, (La. App. 5 Cir. 12/30/02), 836 So.2d 577, 579-581, writ denied, 03-0705 (La.10/17/03), 855 So.2d 757; State v. Martin, 92-811, (La.App. 5 Cir. 5/31/94), 638 So.2d 411; State v. Armant, 97-1256, pp. 3-8 (La.App. 5 Cir. 5/27/98), 719 So.2d 510, 512-517, writs denied, 98-1884 (La.11/20/98), 729 So.2d 3 and 98-1909 (La.11/20/98), 729 So.2d 4. We find that this assignment of error lacks merit.
In his second allegation of error, the defendant alleges that the trial court erred in failing to grant a mistrial. He argues that the trial court should have granted a mistrial, because he was denied his right to a fair trial after the State questioned him about what he said and did not say after his arrest. He contends that the mistrial should have been granted regardless of the fact that the defendant testified and the testimony was elicited for impeachment purposes, and that the trial was a bench trial.
*1048 In Doyle v. Ohio, 426 U.S. 610, 611-620, 96 S.Ct. 2240, 2242-2246, 49 L.Ed.2d 91 (1976), the defendants were charged with selling marijuana. In their separate trials, each defendant claimed they were framed. The prosecutor attempted to impeach individually the defendants' credibility on cross-examination by inquiring why they had not informed the arresting officer that they were framed. On appeal, the defendants appealed arguing the State erred in using their silence to impeach their credibility at trial. The United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after Miranda warnings for impeachment purposes violates the defendant's due process rights.
However, this Court, in State v. Williams, 04-1309 (La.App. 5 Cir. 4/26/05), 902 So.2d 485, writ denied, 05-1640 (La.2/3/06) 922 So.2d 1173 concluded that not every mention of a defendant's post-arrest silence is prohibited by Doyle. This Court found that Doyle only condemns the use of the defendant's silence at the time of arrest and after his Miranda warnings for impeachment purposes. Therefore, the State cannot make a reference to an accused having exercised his constitutional right to remain silent after being advised of the right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version related by the accused, for the first time at trial. Id. However, an oblique and obscure reference to a defendant's post-arrest silence does not constitute reversible error when the examination does not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning. Id. As a result, the State may pursue a line of questioning that attempts to summarize the extent of the investigation when the questions are not designed to use the defendant's failure to claim his innocence, after his arrest, to impeach his testimony or attack his defense. Id. In addition, the State can refer to evidence of post-arrest silence when it is relevant to rebut the defense's assertion that the arresting officer failed to investigate properly, or the defendant actively cooperated with police when arrested. Id.
In the present case, the defendant was asked by his attorney whether he gave a statement to the police. The defendant replied no. Later, he stated that after Burd identified him, he told "no one in particular," while in the vicinity of the ambulance on the scene, that Arceneaux told him she was going to tell the police that Burd tried to rape her. The defendant admitted that there were a few police officers, in the area, but claimed that he did not direct the statement toward anyone, even though he knew he was under arrest, at the time. The defendant also testified that the reason he didn't tell the police officer that he stabbed the victim because he thought the victim was reaching for the knife was "Because I didn't make a statement."
The admissibility of evidence in a bench trial is different from the requirements in jury trials, because a judge by virtue of training and knowledge of the law is capable of disregarding any impropriety. State v. Anderson, 02-273 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 521, writ denied, 02-2519 (La.6/27/03), 847 So.2d 1254. LSA-C.Cr.P. art. 771 is designed to guard against improprieties in the presence of the jury. This article does not mandate a mistrial in a bench trial when a prohibited question is propounded. State v. Marshall, 359 So.2d 78, 83 (La.1978). Compare, State v. Anderson, supra and State v. Myers, 584 So.2d 242, 253 (La.App. 5 Cir. 1991), writ denied, 588 So.2d 105 (La. 1991).
Even if State's line of questioning was designed to use the defendant's failure to *1049 claim his innocence, after his arrest, to impeach his testimony or attack his defense, we find no basis for the granting of a mistrial. The defendant was tried and convicted in a bench trial. Therefore, the trial court was able to disregard any inferences that would have prejudiced the defendant. In addition, the record shows that the trial was fairly conducted, and there was strong proof of the defendant's guilt. We find this allegation of error to be without merit.
In his third allegation of error, the defendant alleges that the trial court imposed an excessive sentence and should have imposed a sentence less than the mandatory minimum under State v. Dorthey, 623 So.2d 1276 (La.1993). The defendant argues that his 10-year sentence, the minimum allowed for attempted second degree murder, is cruel and unusual punishment under Dorthey, because he has no prior criminal history and a stable employment history. In addition, he argues that the trial court failed to consider various mitigating circumstances under LSA-C.Cr.P. art. 894.1.
Initially, we note that the defendant failed to file a motion for reconsideration of sentence. "Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude . . . the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review." LSA-C.Cr.P. art. 881.1(E). Therefore, the defendant's failure to move for reconsideration of sentence or state specific grounds upon which the motion is based limits the defendant to a bare review of the sentence for constitutional excessiveness. State v. Zaldivas, 836 So.2d at 582-583. Accordingly, the defendant's sentence is limited to an examination only for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Wickem, 99-1261, (La. App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The three factors are considered in reviewing a trial court's sentencing discretion are the nature of the crime, the nature and background of the offender, and the sentence imposed for similar crimes by the same court and other courts. State v. Knightshed, 00-1410, p. 4 (La.App. 5 Cir. 3/28/01), 783 So.2d 501, 504-505, State v. Watts, 99-311, p. 6 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 7583 So.2d 145. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Id., State v. Allen, 03-1205, p. 3 (La.App. 5 Cir. 2/23/04), 868 So.2d 877, 879-880.
In State v. Dorthey, surpa, the Louisiana Supreme Court held that when a trial court determines the minimum sentence mandated by the Habitual Offender Law, LSA-R.S. 15:529.1, makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the *1050 crime," the trial judge must reduce the sentence to one that would not be constitutionally excessive. State v. Dorthey, 623 So.2d at 1280. Even though Dorthey involved a mandatory sentence under the habitual offender laws, the sentence review principles espoused in Dorthey are applicable to mandatory sentences imposed by substantive criminal statutes. State v. Brown, 01-160, (La.App. 5 Cir. 5/30/01), 788 So.2d 667, 675.
Since it is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional, a court may only depart from the mandatory sentence if it finds clear and convincing evidence in the present case that would rebut the presumption of constitutionality. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676. The burden is on the defendant to rebut the presumption of constitutionality by showing:
[h]e is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
State v. Johnson, 709 So.2d at 676, quoting State v. Young, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223.
Downward departures from the minimum sentence mandated by La. R.S. 15:529.1 should only occur in rare situations. State v. Davis, 01-123, p. 6 (La.App. 5 Cir. 7/30/01), 792 So.2d 126, 132. State v. Ventress, 01-1165, p. 7 (La. App. 5 Cir. 4/30/02), 817 So.2d 377, 384. A defendant's record of non-violent offenses should not be the sole reason, or even the major reason, for declaring a mandatory minimum sentence excessive. State v. Johnson, 709 So.2d at 676. The Louisiana Supreme Court has explained:
This is because the defendant's history of violent or non-violent offenses has already been taken into account under the Habitual Offender Law for third and fourth offenders, which punishes third and fourth offenders with a history of violent offenses more severely than those with a history of non-violent offenses.
State v. Lindsey, 99-3302 (La.10/17/00), 770 So.2d 339, 343.
There must be substantial evidence to rebut the presumption of constitutionality. A trial court may not depart from the legislatively mandated minimum, because of some subjective impression or feeling about the defendant. State v. Bell, 97-1134, p. 7 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, 927, writ denied, 98-792 (La.9/16/98), 721 So.2d 477. The Louisiana Supreme Court has cautioned that a departure downward from a mandatory minimum sentence should only be made in rare cases. State v. Johnson, 709 So.2d at 677.
The penalty for a second degree murder conviction is a sentence of life in prison at hard labor without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:30.1(B). The attempt provision states that "if the offense so attempted is punishable by death or life imprisonment, [the defendant] shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence." LSA-R.S. 14:27(D)(1). Therefore, the sentencing exposure for the offense of attempted second degree murder is ten to fifty years. State v. Robicheaux, 03-1063, p. 5 (La.App. 5 Cir. 12/30/03), 865 So.2d 149, 153, writ denied, 04-0381 (La.6/25/04), 876 So.2d 830.
In the present case, the defendant was sentenced to the statutory minimum sentence for attempted second degree murder. The trial judge stated that he considered *1051 the defendant's prior and criminal records, the serious nature of the crime, the defendant's demeanor and testimony, and the pre-sentence investigation before sentencing the defendant. In his appeal, as well as at the sentencing hearing, the defendant only argues that his employment and residential history, and his lack of criminal convictions, not arrests, makes him exceptional. A review of Louisiana jurisprudence revealed no case in which a stable employment and residential history were found to be factors that made a defendant exceptional. The defendant has failed to carry his burden of proving a downward departure from the mandatory minimum ten-year sentence was warranted.
This Court has previously upheld 25 and 50 year sentences imposed on defendants convicted of attempted second degree murder, who lacked prior felony convictions. See State v. Napoleon, 01-1222, pp. 2-5 (La.App. 5 Cir. 2/26/02), 811 So.2d 980, 981-984 and State v. Stacker, 836 So.2d at 608. We find that this allegation of error is without merit.
The record has been reviewed for errors patent in accordance with LSA-C.Cr.P.art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note the following.
First, the bill of information charged the defendant, in count one, with attempted second degree murder, but erroneously stated that it was a violation of LSA-R.S. 14:30.1. In addition, the bill of information charged the defendant, in count two, with attempted armed robbery, but erroneously stated that it was a violation of LSA-R.S. 14:64. On the day of trial, the State amended the bill of information to reflect the correct statutory violations. However, while defense counsel stated he did not have an objection to the amendment, the record does not reflect that defendant was arraigned on the amended bill of information. LSA-C.Cr.P. art. 555 provides that a "failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty." Since the defendant proceeded to trial without an objection, any irregularity in the arraignment was waived. State v. Charles, 00-1586 (La. App. 5 Cir. 6/27/01), 790 So.2d 705, 712.
Second, the commitment/minute entry indicates that the trial court informed the defendant that he had two years after his judgment of conviction and sentence became final to seek post-conviction relief. However, the sentencing transcript indicates that the trial court incorrectly informed the defendant that he had two years to file for post-conviction relief. LSA-C.Cr.P. art. 930.8(A) states that a defendant has two years after the judgment of conviction and sentence has become final to file for post-conviction relief. It is well settled that when the transcript and a minute entry conflict, it is the transcript that prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). See, State v. Wilkinson, 00-339, p. 13 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 771, writ denied, 00-3161 (La.10/12/01), 799 So.2d 494. Therefore, we remand this case and order the trial court to inform the defendant of the correct prescriptive period for filing for post-conviction relief by sending appropriate written notice to the defendant after the rendition of this Court's opinion and filing written proof that the defendant received the notice in the record. State v. Hutchinson, 02-60, (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 509.
Accordingly, we affirm the defendant's conviction and sentence. We remand the case to the district court with instructions for the trial court to correctly inform the *1052 defendant of the prescriptive provisions for seeking post-conviction relief.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.