CLARENCE E. McMANUS, Judge.
| gDefendant, Willie Riley, appeals his conviction of attempted second degree murder. For the reasons which follow, we affirm defendant’s conviction and sentence.

STATEMENT OF THE CASE

On October 27, 2010, the Jefferson Parish District Attorney filed a bill of information charging defendant, Willie Riley, with attempted second degree murder of Robert Geneste, in violation of LSA-R.S. 14:30.1 and LSA-R.S. 14:27. On the same day, defendant pled not guilty at arraignment.
Defendant filed a motion to appoint a sanity commission to determine competency to stand trial on January 7, 2011. After a hearing on February 9, 2011, the trial court determined that defendant was competent to stand trial.
After a two-day trial, a unanimous jury found defendant guilty as charged on March 2, 2011. On March 17, 2011, defendant was sentenced to 25 years at hard labor, with credit for time served. Defendant now appeals his conviction.

FACTS

The following facts were elicited at trial in this matter. Robert Geneste, the victim, supervised the defendant, Willie Riley, who operated the forklift at the ^Diamond *1146 Paper Company for over twenty years. Riley would sporadically come to work intoxicated. Because this presented a safety hazard, Riley was suspended on at least one occasion, although he was never fired.
On September 20, 2010, Geneste believed Riley was intoxicated and drove him to a drug testing facility, located at 5500 Mound Street, in Metairie, to be tested. At the facility Riley refused to sit down and was observed exiting the kitchen area. Eventually, Riley became agitated and twice attempted to leave. The second time, Geneste reminded Riley if he refused to take the test it would be considered that he tested positive, and Riley began fighting with Geneste. Although Geneste never fought back, Riley eventually pulled a knife, and stabbed Geneste six times despite the fact that Geneste was begging for his life. Eventually, Williams Keith intervened and assisted in recovering the knife from Riley. At that point, Riley ran away and was later apprehended by police. Geneste was transported to University Hospital and treated for life threatening injuries. Geneste survived and Riley was charged with attempted second degree murder.
The victim, Robert Geneste, testified that at the time of trial, he had been the warehouse supervisor for Diamond Paper Company for 30 years. Geneste supervised Riley, who was a forklift operator. Riley had been a forklift operator for 22 years and Geneste was his supervisor for the entirety of that period. Riley had issues with alcoholism that caused problems between him and Geneste at work. In the beginning of his employment Riley would seldom come to work intoxicated and he performed well. Periodically, Riley would arrive intoxicated and he would be removed from the forklift and sent home for safety reasons. Geneste also reprimanded Riley on several occasions. Over time, Riley would come to work intoxicated frequently.
| ¿Finally, Geneste suspended Riley until he received treatment. With Geneste and Diamond Paper Company’s assistance, Riley began attending Alcoholics Anonymous and eventually he was allowed to come back to work. In order to return to work, Riley agreed to drug testing, to be performed either randomly or upon suspicion.
At first, Geneste had no issues with Riley or his work performance. After some time, Geneste began to have suspicions that Riley was drinking and his demeanor gradually changed. When Riley was not drinking, he was calm and quiet, but when he drank, he became increasingly “talkative and demonstrative.”
Then, on the morning of September 20, 2010, Geneste heard Riley yelling and complaining, and noticed an overall change in his demeanor. Geneste suspected Riley had been drinking and informed him that he would have to take a drug test.
Geneste brought Riley to the drug facili7 ty, which took approximately 30 minutes. Both Geneste and Riley remained silent the entire trip. Once they arrived, Riley refused to sit, and instead walked up and down the hallway while Geneste was filling out paperwork with Keith, an employee of the facility. When Keith was ready to see Riley, Geneste went to look for him and observed him exiting from the kitchen area.
While awaiting the test, Riley became increasingly agitated and attempted to leave. Geneste placed his hand on Riley and explained to him that if he refused the test, it would be considered a positive result and he would be terminated. As he was leaving, Riley’s t-shirt got caught in Geneste’s hand and Riley began swinging at him. Geneste backed away but did not fight back. Riley pulled a knife out of his *1147 pocket and, after a struggle, stabbed Gen-este numerous times. In an attempt to get Riley to stop, Geneste begged: “Willie don’t do this I have a new grandson.” |BInstead, Riley continued to stab Geneste until Keith intervened and assisted Gen-este in disarming Riley. Riley immediately ran away.
In all, Geneste was stabbed six times, in the head, abdomen, scalp, and back. He was bleeding internally and lost 75 milliliters of blood. Geneste testified that he was bleeding profusely and believed he was going to die. He identified the defendant in open court as the person who stabbed him.
On cross-examination, Geneste admitted that he never observed Riley drinking on the job. Geneste denied ever calling Riley derogatory names. He also denied grabbing Riley at the drug testing facility and forcing him to sit down.
On re-direct, Geneste adamantly denied that he told Riley at the drug testing facility: “[s]it your ass down mother
William Keith, Jr., an employee of the drug facility, witnessed the stabbing. His testimony was substantially similar to that of Geneste. Keith testified that Geneste was calm, while Riley was pacing up and down the hallway. At first Riley was calm; however, when Keith informed him he could not leave, he became agitated, asking “why [they] were doing this to him.” Riley continued to pace up and down in the hallway and again attempted to leave. At that point, Geneste grabbed Riley by the shirt, near the shoulder, in an attempt to detain him. Riley then punched Geneste and a fight ensued and continued down the hallway. While trying to separate the men, Keith noticed that Riley had a knife. Keith immediately ran into the office to dial 9-1-1. While attempting to contact the police, Keith could hear Geneste beg Riley to stop. Because his attempt to reach 9-1-1 was unsuccessful, Keith returned, intervened in the fight, and assisted in recovering the knife. Riley immediately fled, Keith again dialed 9-1-1 and assisted Geneste until the ambulance arrived.
lfiIn addition, Keith testified that Riley was given a breath alcohol screen, he passed it, and returned to work. Keith also denied that Geneste told Riley: “sit down mother f* * *er.” Keith identified Riley as the person who stabbed Geneste in open court. He also identified the paring knife as one that they kept in the office kitchen.
Deputy Mark Innazzo, of the Jefferson Parish Sheriffs Office, responded to the incident. When he arrived, Geneste was in the ambulance; however, he appeared calm and lucid. Geneste was taken to University Hospital, and was treated for six stab wounds. One of the stab wounds was particularly life threatening as it was near the kidney. On cross-examination, Innazzo testified that he was unaware of the events that transpired before the incident.
Deputy Gerard Patterson of the Jefferson Parish Sheriffs Office testified that he apprehended Riley, who identified himself, in Jefferson Parish. At the time, Riley had dried blood, and two alcoholic beverages on his person. Riley was positively identified by Keith. Patterson identified Riley in court as the person he apprehended on the day of the incident. On cross-examination, Patterson admitted that Riley was cooperative once he approached him.
Janet Thibodeaux testified that she had been employed with Diamond Paper Company for 21 years. Thibodeaux testified that during the course of her employment, she heard Geneste curse at, fuss at, and berate the men in the warehouse, calling them stupid and other obscenities. Thibo- *1148 deaux testified that Riley was a good worker and he always followed direction.
On cross-examination, Thibodeaux testified that Diamond Paper was a good place to work, she loved her job, and everyone got along well. Thibodeaux was surprised to learn that Riley stabbed Geneste, and she never expected that to happen. Thibo-deaux testified that although Riley was a good worker, he would |7come to work drunk. She also felt it appropriate that Riley was reprimanded or “fussed” at when he came to work intoxicated. Thibo-deaux agreed that Geneste and Diamond Paper could have fired Riley, but, instead, they suspended him and eventually allowed him to return to work. On redirect, Thibodeaux testified that it was difficult to work for Geneste.
Rosalyn Poret, who worked in customer service at Diamond Paper Company, testified that Geneste was “not nice” to her, explaining that he tried to have her reprimanded. She also testified that Riley loved Geneste and would do anything Gen-este asked him to do.
On cross-examination, Poret testified that she was shocked to learn that Riley stabbed Geneste, and she agreed she did not expect it. She agreed that if Riley had come to work intoxicated, then reprimand by Geneste was appropriate. Poret admitted that she saw Riley and Geneste just before they left to go to the drug testing facility. She did not observe Geneste yelling or behaving inappropriately toward Riley.
Glen Lee Riley (“Glenn”), defendant’s brother, drove a forklift for Diamond Paper Company. Glenn testified that Gen-este would call employees “stupid and MF.” On cross-examination, Glenn testified that nothing he had observed at work led him to believe that his brother would stab Geneste. Glenn declared that his brother was a perfect worker, and did not believe he ever came to work drunk. Glenn admitted that Riley had a drinking problem, but explained that he received treatment. Glenn also admitted that Gen-este played a role in facilitating Riley’s return to work after he was suspended for being intoxicated at work.
Glenn agreed that Geneste treated everyone fairly, there was no major issue between Geneste and Riley, and that Gen-este “fussed” at people with reason. |sGlenn also agreed that nothing had ever happened at work that would explain why Riley stabbed Geneste.
Earl Dunbar, a driver and assistant supervisor for Diamond Paper Company, testified that Geneste’s manner of discipline was “obnoxious.” Dunbar never heard Geneste curse; however, he did hear him yell and call the employees stupid when disciplining them.
Dunbar testified that on the day of the incident, Riley was calm, collected, and did not appear to be drunk. Dunbar further testified that he never observed Riley in a drunken state. On cross-examination, Dunbar admitted that he was surprised to learn of the stabbing, and nothing he saw at work led him to believe that something like that would happen. He also admitted that he too “fussed” at people. When the State confronted Dunbar with his earlier statement to the prosecutor and his investigators, where he indicated that he had seen Riley intoxicated at work, he denied ever making such a statement.
The defendant, Willie Riley, testified that when he returned from his suspension, Geneste treated him badly, referring to him as “MF” instead of his name. Riley also testified that Geneste would discipline him in front of other employees and customers. Riley testified that he loved Gen-este and he did not intend to kill him.
According to Riley, on the day of the incident, Geneste continued berating and *1149 insulting him until they reached the testing facility. On the way to the facility, Geneste threatened to put him out of the car. Riley stated that Geneste told him to “sit [his] ass down” approximately 15 to 16 times. Riley tried to walk out of the door twice; however, on the second time, Gen-este “snatched” him back inside and forced him to sit down. Riley “lost it,” and only remembered being arrested later. | ¡¡Riley stated that he complained about Geneste, but the feedback was that Geneste was in control of the warehouse.
On cross-examination, Riley admitted to being intoxicated at work because he had a problem with alcohol. Although he admitted drinking after the incident, Riley denied ever being angry with Geneste or drinking on the morning of the incident. Riley stated that Keith also called him a few names while he was at the testing facility. Riley explained that he never pulled the knife from his pocket, rather he picked it up in the kitchen during the fight. Riley admitted that on direct examination he had stated that he could not remember anything about the stabbing; however, he explained his attorney did not go into as much detail.

ASSIGNMENT OF ERROR N UMBER ONE

On appeal, defendant argues the evidence was insufficient to support the verdict because the evidence failed to establish the requisite intent for second degree murder. Defendant contends that the evidence supported the lesser verdict of attempted manslaughter.
The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4115/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id.
11ft“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572, p. 7 (La.App. 5 Cir. 12112/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. However, this requirement does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. State v. Lathers, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id. (citation omitted).
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, unit denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony *1150 of one witness, if believed by the trier-of-fact, is sufficient to convict. State v. Addison, 00-1730, p. 4 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 613, writ denied, 01-1660 (La.4/26/02), 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence absent impingement on the fundamental due process of law. Bal-ley, supra.
Second degree murder is the killing of a human being when the offender has a specific intent to kill. LSA-R.S. 14:30.1 “Any person who, having a specific Inintent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended.” LSA-R.S. 14:27. To prove attempted second degree murder, the State must establish, beyond a reasonable doubt, that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. State v. Hebert, 05-1004, pp. 9-10 (La.App. 5 Cir. 4/25/06), 930 So.2d 1039, 1046-47. (citation omitted). Specific intent to inflict great bodily harm is sufficient to support a murder conviction, but second degree attempted murder requires a specific intent to kill. Id. at 1047. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Id. (citations omitted).
Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight, 09-359, p. 14 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317, writ denied, 10-2444 (La.10/21/11), 73 So.3d 376. Specific intent to kill may be inferred from the extent and severity of the victim’s injuries. State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, writ denied, 03-0411 (La.10/10/03), 855 So.2d 327.
Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Graves, 99-113, p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00), 759 So.2d 68.
In the present case, the State proved that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. The evidence reflects that while at the testing facility, Geneste observed Riley exiting the kitchen, where the paring knife was kept. After Riley started Infighting with Geneste, he reached into his pocket and pulled out the knife, which he used to stab Geneste six times causing life threatening injuries. Riley testified that he did not intend to kill Geneste. The jury clearly did not believe this testimony.
On appeal, Riley argues that he was essentially driven into rage because of Geneste’s continued verbal abuse. In order for the defendant to be convicted of manslaughter or attempted manslaughter, the evidence would have to show that the homicide or attempted homicide, which would have been second degree murder or attempted second degree murder, was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. State v. Brumfield, 04-552, pp. 5-6 (La.App. 5 Cir. 10/26/04), 887 So.2d 554, 557. (citations omitted). Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Rather they are mitigatory factors which may reduce the grade of the offense. Id. In order to be entitled to the lesser *1151 verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id. (citation omitted). However, the provocation shall not reduce the homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. Id. (citations omitted).
The jury clearly found that defendant failed to meet his burden of proof that defendant was provoked and/or that he acted in “sudden passion” or “heat of blood.”
Geneste testified that both he and Riley remained silent the entire trip. While awaiting the test, Riley became increasingly agitated and attempted to leave. Gen-este placed his hand on Riley and explained to him that if he refused the test, it 11swould be considered a positive result and he would be terminated. As he was leaving, Riley’s t-shirt got caught in Geneste’s hand and Riley began throwing punches at him. Geneste backed away but did not fight back. Riley pulled a knife out of his pocket and, after a struggle, stabbed Gen-este numerous times.
Keith’s testimony was substantially similar to that of Geneste. Keith testified that Geneste was calm, while Riley was pacing up and down the hallway. At first Riley was calm, (Keith never heard him cursing at Riley); however, when Keith informed him he could not leave, he became agitated, asking “why [they] were doing this to him.” Riley continued to pace up and down in the hallway and again attempted to leave. At that point, Geneste grabbed Riley by the shirt, near the shoulder, in an attempt to detain him. Riley then punched Geneste and a fight ensued and continued down the hallway. While trying to separate the men, Keith noticed that Riley had a knife.
Conversely, according to Riley, on the day of the incident, Geneste continued berating and insulting him until they reached the testing facility. On the way to the facility, Geneste threatened to put him out of the car. Riley stated that Geneste told him to “sit [his] ass down” approximately 15 to 16 times. Riley tried to walk out of the door twice; however, on the second time, Geneste “snatched” him back inside and forced him to sit down. Riley “lost it,” and only remembered being arrested later. Riley testified that he did not remove the knife from his pocket; rather, he took it out of the kitchen at the time of the fight.
The jury clearly believed Keith and Geneste’s version of events and found there was not sufficient provocation to deprive an average man of his self-control. Even assuming that the jury believed that Geneste grabbed Riley and cursed at him and forced him to sit down, the jury still could have found that there was not | sufficient provocation. Rather, an average man might have simply called the police or continued on out of the door.
Defendant also claims that there was no evidence that the attack was planned; however, he appears to be incorrect in that contention. Geneste testified that before the incident, he observed Riley exiting the kitchen. He also testified that after Riley started fighting with Geneste, Riley reached into his pocket and pulled out the knife. This evidence clearly suggests that defendant was angry that he was being forced to take a drug and alcohol test and that he planned to attack Geneste before Geneste ever allegedly “snatched” him and caused him to lose control.
Considering the foregoing, we find that the evidence was sufficient under Jackson to support the jury’s finding that Riley had specific intent to kill the victim, and was thus guilty of attempted second degree murder. Moreover, a review of the *1152 evidence indicates that a rational trier-of-fact could have rejected the testimony Riley and the other defense witnesses and found that defendant failed to establish the mitigatory factors for an attempted manslaughter verdict. Thus, we affirm defendant’s conviction of attempted second degree murder.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). This review did not reveal any errors requiring corrective action.
Accordingly, we affirm defendant’s conviction and sentence for attempted second degree murder.

AFFIRMED