# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-659

STATE OF LOUISIANA

VERSUS

KERRY BERTRAND

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 81,691
HONORABLE KRISTIAN D. EARLES, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of Jimmie C. Peters, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

Burleigh G. Doga
Assistant District Attorney
Post Office Box 288
Crowley, Louisiana 70526-0288
(337) 788-8831
Counsel for Appellee:
        State of Louisiana

Edward K. Bauman
Louisiana Appellate Project
Post Office Box 1641
Lake Charles, Louisiana 70602-1641
(337) 491-0570
Counsel for Defendant/Appellant:
        Kerry Bertrand

**KEATY, Judge.**

Defendant, Kerry Bertrand, was charged by bill of indictment with the second degree murder of his twenty-year-old stepdaughter, Skylar Credeur, in violation of La.R.S. 14:30.1. He waived formal arraignment and entered a plea of not guilty. A unanimous jury convicted him of the charged offense, and the trial court imposed a mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant appeals. For the following reasons, we affirm Defendant's conviction.

## DISCUSSION

On August 21, 2013, authorities responded to a call that Defendant and the victim were alone in her home after a restraining order had been issued against him. There, they found the victim's lifeless body in a bathtub with a laptop computer lying across her upper body. Shortly thereafter, Defendant was found hiding in the attic of the home. An autopsy revealed that the victim's cause of death was drowning with strangulation or attempted strangulation before or during the drowning.

### *Sufficiency of the Evidence*

In his first assignment of error, Defendant contends that "[t]he circumstantial evidence adduced at trial was insufficient to support the conviction of second degree murder beyond a reasonable doubt."

Second degree murder is defined as the "killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). Specific intent is defined in La.R.S. 14:10(1) as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." In *State v.*

*Thibodeaux*, 15-723, pp. 4-6 (La.App. 3 Cir. 4/13/16), 190 So.3d 426, 430-31, this court discussed the standard to be applied in cases where the sufficiency of the evidence is challenged and the case is based on circumstantial evidence:

> The supreme court set forth the standard of review for evaluating the sufficiency of the evidence on appeal in *State v. Macon*, 06-481, pp. 7-8 (La.6/1/07), 957 So.2d 1280, 1285-86, where it held:
>
>> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*
>>
>> . . . .
>
> The fifth circuit discussed the criteria for reviewing circumstantial evidence in the case of an attempted second degree murder in *State v. Riley*, 11-673, p. 10 (La.App. 5 Cir. 3/13/12), 90 So.3d 1144, 1149-50, *writ denied*, 12-855 (La.9/28/12), 98 So.3d 828, where it held:
>
>> "Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts." *State v. Kempton*, 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. However, this requirement does not establish a standard that is separate from the *Jackson* standard, but instead provides a helpful methodology for determining the

2

existence of reasonable doubt. *State v. Lathers*, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. *Id.* (citation omitted).

When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Bailey*, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, *writ denied*, 04-1605 (La.11/15/04), 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier-of-fact, is sufficient to convict. *State v. Addison*, 00-1730, p. 4 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 613, *writ denied*, 01-1660 (La.4/26/02), 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence absent impingement on the fundamental due process of law.

At trial, a number of witnesses testified for the State. Michelle Sarver, a deputy clerk with the Acadia Parish Clerk's Office, testified that on August 13, 2013, a temporary restraining order was issued ordering Defendant to "stay away from" the victim and her residence located at 140 Victor Road in Rayne, Louisiana. A hearing for a protective order was set for August 28, 2013. A separate temporary restraining order was issued on August 15, 2013, ordering Defendant to stay away from his wife, Alidia Credeur Bertrand, and their four minor children, who lived with the victim. The hearing date for this order was also set for August 28, 2013. Deputy James Landry with the Acadia Parish Sheriff's Department testified that he personally served Defendant with the summons for the temporary restraining orders regarding the victim and his wife on August 14, 2013, and on August 15, 2013, respectively.

Dr. Mark Dawson, the coroner of Acadia Parish for thirty-two years, testified that he received a call from the Acadia Parish Sheriff's Department on the afternoon of August 21, 2013, requesting that he go to the victim's home. Upon his arrival, he found the victim deceased in the bathtub. Several officers from the Acadia Parish Sheriff's Department had arrived on the scene before him. Dr. Dawson described the bathroom as being in disarray with a shower curtain and towels on the floor and a laptop computer on the lavatory next to the bathtub. The power cord was attached to the computer and was plugged into the wall.

According to Dr. Dawson, there was no obvious cause of death. On the death certificate, he listed the cause of death as drowning. When asked what his initial thoughts were as to a cause of death, Dr. Dawson responded that electrocution and possible drug overdose were the two things that came to mind. He ordered an autopsy of the body, which indicated the cause of death was drowning. On cross-examination, Dr. Dawson acknowledged that one of the possibilities for the cause of death was accidental electrocution.

Dr. Terry Welke, who was accepted by the trial court as an expert in the field of forensic pathology, performed the autopsy on the victim's body at the request of Dr. Dawson. His examination revealed that there was white foam coming from the victim's nose and mouth which is consistent with drowning. He also found watery fluid in her stomach. Dr. Welke observed "little dashed scrapes" around the neck which he felt were caused by irritation from the thin necklace she was wearing; fresh bruises on the back of her left shoulder, on her right shoulder, and on the back of her right hand; as well as a couple of scrapes on one of her arms. When he pulled back the victim's scalp, there was a bruise on the undersurface of the scalp consistent with a forced injury directly on the top of the

4

head, "like someone or something had either fallen on her head or somebody hit her on the head." Dr. Welke's examination also revealed petechiae, or pin-point bruises, on the outside and undersurface of the victim's eyelids; this is typically caused by pressure being applied to the neck as with strangulation or hanging. Additionally, he stated in his report that the victim had a "faint, linear patterned-bruise across the front of the neck," which was similar in appearance to the victim's thin, metal necklace. Finally, when he looked at the inside of the victim's neck, he observed some blood and a bruise in the area of the thyroid gland.

Dr. Welke explained that he was trained that in order to rule a death a homicide, he had to be 100% certain that there was no other cause of death, whereas with accidental or natural deaths, he only had to be 51% certain before he called it one way or the other. Dr. Welke testified that because a laptop computer was found near the victim's body, he explored the possibility that the victim died from electrocution in order to exclude all other causes of death. Dr. Welke stated that ground fault outlets have a button that turns the electricity off and another button that turns it back on. He explained that if a person stepped into a bathtub while holding an electrical appliance, the circuitry will be shut off so the person does not get electrocuted. Dr. Welke explained injuries/deaths from electrocution as follows:

> Q. Can you tell us, in your experience and training, what evidence, if any, there is of electrocution that you could apply to this case in your examination?
>
> A. . . . [W]ith one hundred twenty (120) volts, which is what is in the wall, if you grab a bare wire what will happen is, you'll actually feel some twitching in your arm. And one hundred twenty (120) volts, you're not going to see anything. What it does is it causes the heart to go into what's known as an arrhythmia or an irregular heart rate and basically becomes an inefficient pump. People that die as a result of high voltage injuries . . . . [exhibit] extensive tissue damage.

You can see arms where the muscles are essentially blown out basically. I mean, it looks like it's blown out, it's not, but it tears muscle and it can do damage on the inside. So, with one hundred twenty (120) volts you're probably not going to see anything. . . . Even if your heart is not pumping efficiently, you still have ten (10) seconds, basically, of doing something even after you've been electrocuted with one hundred twenty (120) volts. So, since there's really no - being unable to see with one hundred twenty (120) volts, because sometimes we might see a little burning on the skin, but a lot of times we won't see anything at all. So, everything had to be ruled out before I could rule out electrocution in this case. Which I felt I did.

. . . .

Q. Hypothetically, Doctor, let[']s say that there was a powered, electrically powered laptop in the tub with the victim. Okay? Does that make any difference in that scenario where you have water, which I'm assuming is a conductor of electricity?

A. I would assume if it's in the water and there's a ground fault it would have tripped the ground fault. But even - laptops are powered - - Those of you that have a laptop, you have the cord that goes in the wall and then there's a brick, a box, it downsizes the voltage that goes in so that it doesn't burn out your computer. And I think computers go down to . . . nineteen (19) volts, twenty (20) volts, something of that sort. So, I don't think that would - you might get a buzz, I mean, just a little tingling possibly.

. . . .

A. Providing - I'm sorry - providing the brick wasn't in the water.

**BY MR. ALONZO:**

Providing, I'm sorry, what, Doc?

**BY THE WITNESS:**

A. Well, a powered laptop - the laptops that I have, I have about this much cord between the brick and where the laptop is. (Witness indicates with hands.) If the laptop goes in the water but the brick is outside the tub, I would think that there are, like, only nineteen (19) or twenty (20) volts in the water with the laptop; however, if the brick, or whatever you want to call it, the power source, goes in the water with the laptop then I would think that would be a possibility of one hundred twenty (120) volts there. But if the brick itself where it steps down the voltage from one hundred twenty (120) to nineteen (19) or twenty (20) volts, I think with nineteen (19) or twenty (20) volts, like

6

I said, I think that would just give like a little tingling, if even that, I don't know. I'm not an expert in that sort of thing.

Dr. Welke found no physical evidence consistent with the victim being injured by electrical shock. He testified that he received a letter from the Federal Bureau of Investigation (FBI) stating that its analysis showed "that the computer and the ground fault were doing essentially what they were supposed to be doing." Dr. Welke also explored the possibility of drug overdose, because with drowning, there is a possibility the person passed out and drowned. A toxicology analysis was done, and no drugs were found in the victim's system. In addition, Dr. Welke found that there were no indications that the victim had died of natural causes. Based on those findings, Dr. Welke concluded in his autopsy report that the victim died as a result of drowning with possible attempted strangulation during or before her "head [was] held below the surface of the water," and that the manner of death was homicide.

On cross-examination, Dr. Welke acknowledged that if the victim's computer had fallen into the bathtub and the ground fault did not trip, there was a "strong possibility of electrocution" that would leave no visible signs on her body. Dr. Welke stated that although there is a possibility that the hyoid bone could be broken in a forcible strangulation, he had found only a few broken hyoid bones in strangulation cases he had observed. While his autopsy revealed that the victim's hyoid bone was not broken, Dr. Welke explained such a finding did not indicate that strangulation was not attempted. Although Dr. Welke confirmed that the bruising he found on the victim's neck did not go around her entire neck, he reiterated that the cause of her death was drowning, but there was evidence of strangulation. During questioning, Dr. Welke confirmed that there were no

7

scratches or scrapes on the victim's face and that none of her fingernails were broken. On the other hand, the autopsy revealed that the victim's lungs were wet and "about twice of what the weight should be for somebody her size and weight." Dr. Welke repeatedly testified that the cause of death was drowning, not strangulation.

Mr. Audie Hanks, an electrician, was accepted by the court as an expert in electrical contracting. Mr. Hanks testified that although he was unsure of the exact date, he was contacted by the Acadia Parish Sheriff's Department to conduct an electrical test on a ground fault interrupter (GFI) receptacle on the side of the sink in the victim's bathroom to determine whether it was working properly. Mr. Hanks stated that he used his voltage meter on the receptacle and determined that the receptacle was "tripped." Based upon his inspection and subsequent testing, Mr. Hanks concluded the receptacle was in working order. Mr. Hanks explained that a GFI receptacle has two buttons on it, and its purpose is to protect from anything that is shorted or grounded; if the GFI receptacle is "tripped," the flow of electricity is cut off from the receptacle to whatever is plugged in to prevent electrocution.

On cross-examination, Mr. Hanks confirmed that he did not know how many people had been in the bathroom before he arrived, he did not know if someone tested the receptacle before him, and he did not have any idea what "tripped" the receptacle. Mr. Hanks stated that if the GFI receptacle does not work and something with 120 volts of electricity is dropped into a bathtub with someone, it would likely kill them because "one hundred twenty (120) volts is worse than thirteen thousand (13,000) volts because it holds you."

8

On re-direct, Mr. Hanks confirmed that the voltage would be less in an appliance with a "brick" that steps down the voltage. He testified that he had no knowledge of what type of appliance was involved in this situation and that he was not testifying on how much voltage it takes to kill someone as he had no expertise in that area.

Deputy Lonis Domingue of the Acadia Parish Sheriff's Department testified that he was the first to arrive at the victim's residence at approximately 11:59 a.m. due to a complaint that Defendant was locked in the house with the victim. Upon arrival, Mrs. Bertrand, the complainant, was outside the residence and was very distraught. Deputy Domingue stated that the front door to the residence was "busted open" and that he entered the house with his gun drawn. When he entered the open door to the bathroom, Deputy Domingue observed the victim deceased in a tub of water with a laptop computer across her breast and stomach area. He testified that he did not touch or do anything to the electrical outlet. A short time later, he was joined by Sergeant Glynn Johnson and several more of the victim's family members. Deputy Domingue and Sergeant Johnson removed everyone from the residence and continued looking for a suspect, but one was not located at that time. Deputy Domingue explained that investigators and detectives began arriving, and they took control of the scene.

On cross-examination, after reviewing the report he wrote concerning the incident, Deputy Domingue testified that he did not recall if the laptop was plugged in or unplugged, but that it must not have been plugged in "because [he] wouldn't have attempted to touch the victim with electricity running to the water." Deputy Domingue stated that he did not see any scratches, bruising, or blood on the victim. He explained, however, that as the first responder to arrive on the

scene, his objective was to stop the threat and to secure the area which included preventing anyone from entering the bathroom because detectives would be arriving later to conduct an investigation and collect evidence.

Sergeant Johnson also testified at trial. He stated that after Deputy Domingue informed him of the situation, the two of them entered the house with their guns drawn. They searched the house room by room because someone whom he thought was the victim's grandmother kept hollering, "he's in the house." Sergeant Johnson stated that upon entering the bathroom, he saw the victim submerged in the bathtub with foam coming from her mouth and a laptop on her chest. He did not touch the victim or anything else in the bathroom. Sergeant Johnson distinctly remembered that the cord was plugged into the electrical outlet in the wall, but not into the computer. He did not remove the cord from the electrical outlet. Sergeant Johnson stated that he and Deputy Domingue did not inspect the attic. He recalled that the opening to the attic was high and square with no fold-down ladder. Deputy Domingue testified that he noticed a ladder was leaning in a closed position against the wall of the hallway, but at the time "it never dawned on [him] what it was for."

On cross-examination, Sergeant Johnson testified that there was a shower curtain on the bathroom floor, which he thought was strange, and that the floor was a little wet but not excessively so. He did not recall seeing any bruises or scratches on the victim. However, on re-direct, Sergeant Johnson stated that he did not closely inspect the victim's body.

Edmond Credeur, the victim's uncle, testified that after the scene was cleared and people were allowed inside, he entered the house and decided to check the attic. He used the ladder in the hallway to get into the attic. Upon turning on

10

the attic lights, he noticed that the ones on the east end of the attic were not working, so he retrieved a flashlight. Mr. Credeur made his way across the attic and discovered Defendant lying on his back hiding in the "eve of the roof." Defendant then stood up and said, "I didn't do it." When Mr. Credeur asked him what he didn't do, Defendant "mumbled something about something floating in the bathtub." Mr. Credeur stated that he observed scratches on Defendant's face. Defendant then stated that he was going to come down from the attic, so Mr. Credeur alerted the deputies. Mr. Credeur then sought assistance from his two stepsons who had come to the victim's house with him. Once the boys joined him in the attic, a deputy gave them handcuffs to put on Defendant. After Defendant was brought down from the attic, Mr. Credeur pointed out the scratches on his face to the deputies. According to Mr. Credeur, Defendant accused him and his stepsons of scratching his face, but Mr. Credeur denied those accusations.

Corey Arnaud, Mr. Credeur's stepson, testified that when they asked Defendant why he was in the attic, he said, "Well, if you find your daughter dead in a bathtub[,] what would you do?" They told him, "Well, we'd call 911. We surely wouldn't be hiding in the attic." Mr. Arnaud confirmed that he did not scratch Defendant's face, and he did not see anyone else do so.

Deputy Marcus Deville of the Acadia Parish Sheriff's Department testified that he worked in the parish jail in December of 2013. On December 16, 2013, while he was working in the jail's control room, he heard Defendant tell fellow inmate Ovey Wilson that he had cleaned the crime scene the best he could and that he wore gloves. Deputy Deville then heard Mr. Wilson ask Defendant if he had checked under the victim's fingernails. Defendant responded in the negative and stated that it was the only mistake he made.

Bethany Harris, an employee of the Acadiana Crime Lab, was accepted as an expert in DNA analysis by the court. She explained that she tested the forty-five to fifty items submitted to her from the victim's bathroom against referenced DNA samples from the victim; Defendant; the victim's mother and Defendant's wife, Mrs. Bertrand; four children of Defendant and his wife, namely Blake, Drake, Evan, and Taylor Bertrand; and the victim's boyfriend, Bryar Babineaux. Ms. Harris stated that while the DNA profile of several of tested items excluded Defendant, there were several other items of which she could not draw any conclusions regarding Defendant. She explained that when her testing revealed "no conclusion" regarding whether Defendant's DNA was on an item, he may have touched the item but she was unable to ascertain whether or not he did so. According to Ms. Harris, heat and water can degrade or wash away DNA and, thus, affect the results of DNA analysis.

On cross-examination, Ms. Harris stated that she was not able to conclusively include Defendant's DNA profile in any of the items she tested from the victim's bathroom. Ms. Harris stated that the analysis in this case was complicated because of the number of reference samples she had of Defendant's biological children which resulted in overlapping DNA profiles. In testing swabs of the victim's left and right fingernail clippings, there was a presumptive indication that blood may be present; however, Ms. Harris did not take the next step to confirm the presence of blood because the sample was too small. The profile matched the victim and excluded Defendant and other family members as the source of that DNA profile. No male DNA was found on her left fingernail clippings, but a mixed profile consisting of DNA from at least three male individuals was obtained from her right fingernail clippings. Defendant and the

victim's brothers were excluded from this profile, but the victim's boyfriend was not.

Ryan LeBleu, a convicted felon, testified that while he was in the Acadia Parish jail between May 31 and August 12, 2013, he was housed in the same tier with Defendant, when Defendant was there on another charge. During this time, Defendant told Mr. LeBleu that his stepdaughter had some kind of way "brought back up charges of molestation" for which Defendant had already been imprisoned and released. According to Mr. LeBleu, Defendant said the reason his stepdaughter did so was because "he wanted her out of the house." Defendant referred to his stepdaughter as a "bitch," and he told Mr. LeBleu that he was going to make her pay for what she had done to him. Mr. LeBleu testified that although Defendant did not go into detail with him, he heard Defendant tell others seated at a table with them that he was going to drown his stepdaughter in a tub and take her to a lake or swamp where no one would find her body. Mr. LeBleu explained that when he saw the story of the victim's death on the news, he contacted the Acadia Parish Sheriff's Department and gave a statement. Mr. LeBleu testified that since that time, he has had no pending charges, and he has not asked for, been offered, nor received anything in exchange for his testimony. On cross-examination, Mr. LeBleu testified that he suffers from several mental disorders, including bi-polar, schizoaffective, and post-traumatic stress. He explained that his schizoaffective disorder means that he is paranoid, but when asked, he affirmed that it does not involve fantasies, imaginations, stories, or lies.

Lieutenant Patrick Kirsch, Chief of Investigations with the Acadia Parish Sheriff's Department, testified that when he took Mr. LeBleu's statement regarding

this incident on August 21, 2013, Mr. LeBleu did not mention anything about Defendant throwing a body in a swamp or planning to drown the victim.

In support of Defendant's claim of insufficiency of the evidence, Defendant's appellate counsel focuses on a number of facts, or lack thereof, such as: the lack of water in the bathroom as would be expected if the victim fought for her life, the victim's intact hyoid bone and fingernails, the absence of Defendant's DNA on the items swabbed in the bathroom, the absence of Defendant's DNA under the victim's fingernails, the fact that a person can die from electrocution without showing any visible signs per Dr. Welke, and the absence of details of Defendant's planned killing in Mr. LeBleu's statement taken by Lieutenant Kirsch. Finally, appellate counsel notes that it is highly possible Defendant was hiding in the attic because "he panicked when he found the body and hid knowing he would be the first and only suspect who had already violated a restraining order."

We conclude that the evidence presented by the State was sufficient to prove Defendant's guilt beyond a reasonable doubt. The State established that the victim had secured a restraining order against Defendant and that he had previously been imprisoned as a result of charges brought by her. The State also presented testimony that the Acadia Parish Sheriff's Department responded to a call that Defendant was alone in the house with the victim. Upon entering, deputies found the victim deceased in a bathtub. Although there were arguably no signs of a major struggle having taken place, Dr. Welke testified that the victim had sustained a forced injury directly on the top of her head. This could have easily prevented her from putting up a violent struggle. Dr. Welke's conclusion, based on his autopsy of the victim's body, was that the victim died from drowning preceded by, or concomitantly with, strangulation or attempted strangulation. This was

14

Defendant's plan as testified to by Mr. LeBleu, a witness that the jury heard and had the choice to believe. Finally, Defendant attempted to conceal himself in the attic to evade capture, a further indication of his guilt. *See State v. Davies*, 350 So.2d 586 (La.1977). Considering the evidence presented in this case, we conclude that the State proved Defendant's guilt beyond a reasonable doubt.

### *The Trial Court's Allowance of Testimony Regarding the FBI Report*

Defendant contends that the trial court erred in allowing Dr. Welke to testify that he relied on an FBI report indicating that the ground fault interrupter was working properly. He claims allowing this testimony without the opportunity to cross-examine the individual who prepared the report violated Defendant's constitutional right to cross-examine the witnesses against him. Defendant cites no cases in this assignment of error other than one establishing that a coroner's report is an exception to the hearsay rule and can be admitted as proof of death and the cause thereof, which is not the issue here.

Dr. Welke testified that "once I had that report that the computer and the ground fault were doing essentially what they were supposed to be doing, then the final decision was made and the conclusion was made that the cause of death and manner of death was listed as a homicide." He explained that the report was actually a letter from the FBI which he received from the Acadia Parish Sheriff's Department. When Dr. Welke produced the letter, Defendant's trial counsel informed the court that he had never seen the letter, and he had no way to respond to it. He stated that had he known of the letter, he would have retained an expert to respond to it. The prosecutor stated that he believed he provided every document in his file to defense counsel in open file discovery, but he had no proof.

15

Defendant's request for admonition and request to strike the portion of the testimony about the FBI was denied. The FBI report was a proffered exhibit.

In *State v. Mullins*, 14-2260, 14-2310, pp. 2-9 (La. 1/27/16), 188 So.3d 164, 167-71, the supreme court addressed a similar issue:

> Defendant . . . . argues that allowing Dr. Mark Vigen, the State's expert psychologist, to present evidence as to the results of IQ testing he did not administer or score violated the Confrontation Clause of the United States Constitution. Next, Defendant argues that the lower courts erred in allowing hearsay testimony and the introduction into evidence of a letter Dr. Vigen prepared in advance of trial, both of which were based on information gained from persons who did not testify. Next, Defendant argues that the lower courts erred in allowing the introduction of Dr. Vigen's letter, where the letter contained hearsay, not subject to any exception. Finally, Defendant alleges that the court of appeal erred in failing to find that the trial court had erred in allowing expert testimony where the State failed to comply with Article 705(B) of the Code of Evidence.

> . . . .

> The United States Supreme Court has explained that the Confrontation Clause applies to "testimonial" statements. . . .

> . . . .

> In sum, United States Supreme Court jurisprudence tells us that testimonial evidence includes prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. *Crawford* [*v. Washington*], 541 U.S. [36], 124 S.Ct. [1354 (2004)]. We also know that statements made for the primary purpose of seeking help during an ongoing emergency are not testimonial, *Davis* [*v. Washington*], 547 U.S. [813], 126 S.Ct. [2266 (2006)]; [*Michigan v.* ]*Bryant*, 562 U.S. [344], 131 S.Ct. [1143 (2011)], while statements made as part of an investigation into possible criminal past conduct with no emergency in progress are testimonial. *Davis*, 547 U.S. [813]. Testimonial statements include those "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." [*Id*. at] 826[]. When laboratory analysts' affidavits include testimonial statements, a defendant is entitled to confront the analysts themselves. *Melendez-Diaz* [*v. Massachusetts*], 557 U.S. [305], 129 S.Ct. [2527 (2009)]. A document created solely for an "evidentiary purpose," made in aid of a police investigation, is testimonial. *Bullcoming* [*v. New Mexico*], 564 U.S. [647,] at 664, 131 S.Ct. [2705] at 2717 [(2011)].

. . . .

> Confrontation Clause violations do not fit within the limited category of constitutional errors that are deemed prejudicial in every case—the violation of a defendant's right to confrontation may be harmless error. *Delaware v. Van Arsdall*, 475 U.S. 673, 682, 106 S.Ct. 1431, 1437, 89 L.Ed.2d 674 (1986); *State v. Welch*, 1999-1283 (La.4/11/00), 760 So.2d 317, 321-22. Courts analyze such errors by assuming that the damaging potential of the error was fully realized, then asking whether the reviewing court could conclude that the error was nevertheless harmless beyond a reasonable doubt. *Welch*, 760 So.2d at 321-22. The factors to be considered in determining whether the error was harmless include the importance of the testimony of the witness in the state's case, whether the testimony is cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of the cross-examination permitted, and the overall strength of the state's case. *Welch*, 760 So.2d at 321-22.

After having reviewed the foregoing Supreme Court jurisprudence, the *Mullins* court concluded:

> We find that the letter containing the IQ test results and introduced by the State for the primary purpose of proving an essential element of the crime of aggravated rape contains testimonial statements and therefore is subject to Confrontation Clause requirements. As a result, the trial court violated Mr. Mullins' Sixth Amendment rights by ruling the letter could be admitted into evidence without testimony. We further find the introduction of the letter violated the hearsay rule. Accordingly, we reverse the decisions below, vacate Defendant's conviction and sentence, and remand this case to the District Court for a new trial.

*Id.* at 173.

In the present case, after applying the analysis set forth in *Mullins*, we conclude that the trial court may have erred in allowing Dr. Welke to testify about the findings of the FBI report. However, unlike the situation in *Mullins*, the error is harmless in this case. The information regarding the proper functioning of the GFI receptacle was cumulative, at least in part, to the testimony of Mr. Hanks. Additionally, the bruising and petechiae observed by Dr. Welke was indicative of pressure being applied to the victim's neck during the drowning. Further,

17

Defendant was overheard before the murder talking about his intent to kill the victim by drowning, and then after the murder about the fact that he wore gloves and attempted to clean up the crime scene. We conclude that the guilty verdict in this trial was surely unattributable to this error.

## DECREE

Defendant's conviction is affirmed.

**AFFIRMED.**