JANVIER, Judge.
In this controversy only one question is presented. Were the defendants, C. W.. Pope, John T. Charbonnet and William P.. Irwin, members of á partnership or'joint *140 venture which was conducted under the name of Pope Construction Company?
The record shows that the amounts claimed by plaintiff railroad were due by Pope Construction Company. The plaintiff railroad company and Pope have appealed devolutively from a judgment based on the conclusion of the District Court that there was no partnership or joint venture in which Charbonnet and Irwin were involved and that consequently the entire amount sued for is due by Pope alone.
Plaintiff railroad alleges that, at the time of the occurrences on which this suit is based, Pope Construction Company was a partnership composed of C. W. Pope, John T. -Charbonnet and William P. Irwin, and that the said partnership and its individual members are indebted to plaintiff in the sum of $1,418.06 for freight charges on sand, concrete and gravel shipped to the said partnership at Kenner, Louisiana, between October 6, 19S0, and November 2, 1950.
It is not seriously contended that the charges are not due, but John T. Char-bonnet and William P. Irwin maintain that they were not members of the said partnership; that they were not engaged- in a joint venture with Pope, and they therefore deny any liability in them.
The Pope Construction Company and C.’ W. Pope filed’"a general denial but coupled with it an allegation or admission that there was a partnership and that the members thereof, as alleged by plaintiff, were Pope, Charbonnet' and Irwin. Pope contends only that the judgment should have been against the other defendants as well as against him and plaintiff railroad maintains' that the'judgment should have been against all three- defendants.
A tremendously confusing record has been made up which, in addition to the evidence concerning this transaction, contains much evidence about relationships of the three named individuals prior to the occurrences on. which this suit is based, the purpose being to indicate a course of conduct which would show that, for some time before the particular occurrences referred to, the three individuals were engaged in prior joint undertakings somewhat similar to that on which this litigation is based.
The question which is presented is not easily answered. Pope was a contractor who conducted business as Pope Construction Company which was not a corporation. We are called upon to determine whether Charbonnet and Irwin were associated with Pope in the conduct of that business to the extent that their interest therein justifies the conclusion that they were partners, or at least were engaged with him in .a joint venture.
It is not necessary that we consider whether there is any distinction between the liability of partners and the liability of those who are engaged in a joint venture. Partners are those who, on more than one occasion, engaged in business together whereas joint adventurers are those who, for the conduct of some particular transaction, associate themselves together in the hope of making a profit out of that transaction.
We have no doubt that the liability of joint adventurers is the same as is that of partners and accordingly we agree with the statement of our Brothers of the Second Circuit who, in Young v. Reed, La.App., 192 So. 780, 785, said:
“ ‘The relation of joint adventurers is governed by the principles which constitute and control the law of partnership.’ ”■
In W & W Oil Co., Inc., v. American Supply. Co., La.App., 8 So.2d 384, 385, the same court said:
“ ‘ * * * The agreement being for a joint venture is in legal parlance an “ordinary partnership” and governed by the laws applicable to' ordinary partnerships.’ ”
The question then is not whether the defendants regularly engaged in business together for we think there is liability in *141 all of them if only for this one undertaking they associated themselves together and thus engaged in this one joint adventure.
The Pope Construction Company, whether it was a partnership or a joint adventure, or whether it was conducted solely by Pope, determined to engage in the construction of small houses which might be' sold to individuals under plans which might meet with the approval of the Federal Housing Administration. A large tract of land was purchased, not by Pope Construction Company, hut by Taylor Land Company and subdivided, and there were thus provided the lots on which the houses might be constructed and then sold to individual purchasers. Taylor Land Company was “owned” entirely by Charbonnet. An undivided one-third interest in this land was sold by Taylor Land Company to Irwin. Later Irwin transferred his interest to Irwin Land Company, Inc., which apparently was a private corporation “owned” by Irwin.
Pope was an experienced contractor. Charbonnet, who is an attorney, says that he was “not a builder of houses,” that he bought land and developed it and financed people who needed financing, but that he himself did not • engage' in any type of construction. Irwin also 1 seems to have been engaged in the buying of land and to have had some experience in the construction of buildings.
There is some dispute as to whether Pope acquired one-half of the two-thirds interest which the Taylor Land Company retained after transferring a one-third interest to Irwin. Charbonnet says that he gave an option to Pope to acquire a one-third interest, and Pope says that he actually acquired that interest. If he did, then each of the three, Pope, Irwin and Taylor Land Company — owned entirely by Charbonnet — had an undivided one-third interest in the tract.
In order to secure commitments from the Federal Housing Administration under which the purchasers of each improved property might finance the purchase, it was necessary that the Federal Housing Administration .place a value on each lot and also on each house which was constructed, and this value was fixed by the Federal Housing Administration at $750 on each lot. It is shown that the price which had been paid for the entire tract was such that when it was divided into lots each lot had cost Taylor Land Company only about $43.
' The actual construction of the houses was done by Pope, and Charbonnet produced the necessary cash for payrolls, etc. These advances, together with interest at six per cent, were to be repaid to Charbonnet as each house was sold: Irwin was to supervise the expenditures of the money advanced by Charbonnet so that Charbonnet might be certain that those advances went into the construction of the houses.
It is conceded, that , the price at which each house was sold was so. low that it actually represented the cost of the construction plus $750, which was the. Federal Hohsing Administration value placed on each lot, so that, as a matter of fact, whereas there was no profit in the construction of each house, the profit was made out of the difference between the cost price of each lot and the sale price, which was almost $750.
The record shows that this profit amounting to .$750 in each case was actually divided in the • following manner: As the lots were sold to ultimate purchasers, the transfers were made by Taylor Land Company and Irwin to still another corporation known as Pope Park, Inc., in which Char-bonnet and Irwin had no interest. This corporation, out of the purchase price, turned over $750 to Taylor Land Company of which $150 was returned to Pope Construction Company for expenses in connection with the general development of the subdivision, such as improvements of streets, paving, etc.,- and the other- $600 was divided ámong the three, $200 to Pope, $200 to Irwin, and $200 to Charbonnet.
We find in the record no express denial of the statement of the bookkeeper employed by Pope to keep the books of the *142 construction company, of Pope Park, Inc., and of Pope to the effect that the “land profits” of $750 in each case were divided as we have stated. He says that the $600 referred to “was to be equally divided three ways, to Mr. Pope, Mr. Charbonnet and Mr. Irwin.” He says that in each case he had paid the amount of the profit directly to Mr. Charbonnet, but that he did not know himself what division Charbonnet made of the money. “I paid it only to one (1) man * * * Mr. Charbonnet.”
It is the contention of Charbonnet and of Irwin that they were in no way interested in the operation of Pope Construction Company or of Pope Park, Inc., except that Charbonnet advanced to Pope Construction Company money which it needed in the construction of the building's and that Irwin protected the interest of Charbonnet by supervising the expenditures of these sums, and Charbonnet and Irwin both contend that such profit as they made out of the transactions came solely as the result of the difference between the cost of each lot and the sale price of each lot, and the mere fact that their private corporations made a profit on the sale of lots to Pope Park, Inc., should not render them liable for debts of Pope Construction Company.
The question is a very close one. There is, of course, no reason for the slightest intimation that there was anything illegal or reprehensible in the rather complicated systems by which the land was purchased, the houses were built, and the sales' were made to Pope Park, Inc., and then to the ultimate purchasers. A landowner may adopt any legal method for the purpose of enhancing the value of his property and then he may realize that profit by sales at the increased valuations.
When we notice, however, that the sole profit in this complicated combination of corporations and individuals came from the sale of lots and that such profits as did result seemed to have been divided among the three individuals, we cannot look upon the entire undertaking except as a joint adventure or partnership the success of which was made to depend on the carrying out of the entire plan. Surely Pope knew that any profit he might make would come not from construction but from the sale of the completed buildings, and that this profit, as a matter of fact, would come from the enhanced value of the lots.
And Charbonnet and Irwin well knew that there would be no enhanced value of the lots unless the buildings should be completed. Thus Charbonnet, who had a perfect right to loan money for the buildings and who had a perfect right to accept repayment of those advances with interest, had an even greater interest in the successful completion of the buildings as the profit was to come from the sale of the lots and as there would be no profit without the completion of the buildings. The same may be said of Irwin.
The situation which we find here is quite similar to that which we considered in Harding v. Wattigney, La.App., 62 So.2d 190, 194, in which we said:
“In entering into the building scheme, both Harding and Weigel expected to profit therefrom, the former to receive out of the proceeds of the sale of the houses the sum of $2,000 for each of his building sites, while Weigel expected his profit to flow from his end of the venture, that is, the construction of the residences. This agreement amounted to nothing more or less than a joint adventure which is defined by our courts to be a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. See Kennedy v. Perry Timber Co., 219 La. 264, 52 So.2d 847, and Daily States Publishing Co. v. Uhalt, 169 La. 893, 126 So. 228.”
We become even more confident in the correctness of our conclusion that the three defendants were engaged in a joint venture when we find that before this venture was undertaken they had previously engaged in at least one similar venture *143 for the purchase of land and the construction thereon of buildings and in that earlier venture, or possibly in others, the profits were to be distributed on a similar though slightly different basis. The general plan of operations, however, was almost the same. According to 'Charbonnet himself, in one of those earlier ventures, his company advanced the money and in addition to interest was to receive a $500 profit from the sale of each house and Irwin, for supervising the construction was to receive $200. Pope retained the balance of the profit.
We think that the three individuals were engaged in a joint enterprise from which each was to receive a profit. It cannot be said that each was responsible only for his particular portion of the undertaking, Pope for the construction, Irwin for the supervision, and Charbonnet for providing of the funds.
Since there was a joint enterprise .and since the enterprise was such as would be governed by the rules governing ordinary partnerships, each is liable for one-third of the debts. LSA-Civil Code, Art. 2872.
The judgment appealed from, insofar as it runs in favor of John T. Charbonnet and William P. Irwin is annulled, avoided and reversed, and insofar as it runs against C. W. Pope, it is amended, and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Illinois Central Railroad Company, in the full sum of $1,418.06, with interest from judicial demand, and against each of the individuals, C. W. Pope, John T. Charbonnet and William P. Irwin, for one-third thereof, to-wit $472.65, with legal interest from judicial demand and for all costs of the District Court; costs of appeal to be borne equally by John T. Charbonnet and William P. Irwin.
Reversed in part; amended and affirmed in part.