# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-138

**STATE OF LOUISIANA**

**VERSUS**

**MAJOR CARTRELL JONES**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 75788
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Don M. Burkett**
**District Attorney**
**Post Office Box 1557**
**Many, LA   71449**
**(318) 256-6246**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, LA   70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Major Cartrell Jones**

**Major Cartrell Jones**
**Camp D Falcon-2**
**Louisiana State Prison**
**Angola, LA   70712**
**IN PROPER PERSON**

**AMY, Judge.**

The State charged the defendant with second degree murder and manslaughter after the victim's remains were found in the victim's burned home. A forensic pathologist testified that the cause of death was stab wounds to the heart and spleen. Upon testing, DNA consistent with that of the defendant was identified from blood evidence located both at the victim's home and in the victim's car. A jury convicted the defendant of second degree murder and found that the defendant had specific intent to kill. Following a denial of the defendant's post-verdict motions, the trial court sentenced the defendant to serve life imprisonment at hard labor without the possibility of parole, probation, or suspension of sentence. The defendant appeals. For the following reasons, we affirm.

### Factual and Procedural Background

This matter stems from the July 17, 2014 death of the victim, James Paul Green, at his home in Fisher, Louisiana. The record indicates that, on that evening, authorities proceeded to the home after a 911 call from a neighbor informing them Mr. Green's home was on fire. The caller, Melissa DeLoach, explained on the call that Mr. Green's car was not at the residence.[1]

Authorities responded to the scene, including Fisher Chief of Police Lamar Thomas, Jr., a neighbor of Mr. Green. Chief Lamar stated that he could see Mr. Green's home "engulfed" in flames from his front porch. Having noticed Mr. Green drive by his home earlier in the evening, Chief Lamar explained that it "rested [his] mind" when he arrived and found that Mr. Green's Chevrolet Cavalier

---

[1] Ms. DeLoach's stepson testified that from the window of their home he saw the lights in Mr. Green's home go out, come on, and go out again. After seeing a bright flash coming from the residence, he then saw fire coming from the home's kitchen window. Ms. DeLoach thereafter called authorities.

was not at the home. Chief Lamar stated that although the fire was extinguished that night, he returned to the scene the following morning after being informed that firefighters located a body in the residence. Subsequent examination was required to identify the body due to its poor condition. That process revealed Mr. Green to be the victim. Employees of the Louisiana State Fire Marshall explained that although the investigation identified no ignitable liquids, the fire was determined to have started in the kitchen and to have been caused by human intervention.

The record indicates that the investigative team identified blood evidence both at Mr. Green's home and in his car, which was located after it was abandoned in Zwolle. According to Captain Charles Russell Edwards of the Fire Marshall's office, the vehicle was found to contain Mr. Green's wallet as well as three, one-dollar bills. He explained that a fire had been started in the floorboard of the vehicle. The fire did not spread beyond the immediate area.

During their investigation, detectives of the Sabine Parish Sheriff's Department twice interviewed the defendant, obtaining a DNA sample from him at that time for subsequent testing. According to Monnie Michalik, a forensic DNA analyst of the North Louisiana Criminalistics Laboratory, evidence acquired from both the residence and the car, including the money found in the car, were consistent with the defendant's reference sample.[2] Certain samples were consistent with a mixture of DNA consistent with samples from the defendant and Mr. Green.

_____

[2] For example, Ms. Michalik testified that testing performed on a sample taken from the home scene was consistent with the defendant's reference sample. She explained that "[t]he probability of finding that exact same DNA profile from a randomly selected individual on Earth was approximately 1 in 1.3 quintillion[.]" Swabs taken from the driver door and from the passenger-side dashboard of Mr. Green's vehicle were also consistent with the profile taken from the defendant. Ms. Michalik again testified that "they all had a statistic of 1 in 1.13 quintillion."

In May 2016, a grand jury returned a bill of indictment and charged the defendant with second degree murder, a violation of La.R.S. 14:30.1, providing two bases for that charge. The State amended the indictment in August 2016, first asserting that the defendant committed second degree murder by specific intent to kill or inflict great bodily harm upon Mr. Green. *See* La.R.S. 14:30.1(A)(1). The State alternatively alleged that the offense occurred while the defendant was engaged in the perpetration or attempted perpetration of armed robbery or aggravated arson, even though he had no specific intent to kill or inflict great bodily harm. *See* La.R.S. 14:30.1(A)(2).[3]

In opening arguments to the jury, the State alleged that the defendant had persuaded a friend, Tina Sepulvado, to drive him to Fisher on the night of the offense and alleged that he had informed her that he was going to visit his cousin. Referencing the defendant's interviews with investigators, the State argued that the defendant concealed Mr. Green's identity from Ms. Sepulvado as he was travelling to the residence to receive oral sex in exchange for money. The State alleged that, while in the house, the defendant stabbed the victim, once in the heart and once in the spleen, and inflicted additional bodily wounds. Responding, defense counsel questioned both the presence of specific intent to kill and further argued as to the absence of evidence that either of the alleged underlying felonies occurred prior to the defendant's death.

At the close of deliberations, the jury returned a verdict of: "Guilty of Second Degree Murder – Specific Intent to kill." Afterwards, the defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. By those

---

[3] The initial indictment also included first degree robbery, second degree robbery, and aggravated arson as underlying felonies.

motions, the defendant asserted that the testimony from one of the investigating detectives suggested that certain material was not disclosed in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). After hearing additional testimony pertaining to the *Brady* allegation, the trial court denied both motions. The trial court sentenced the defendant to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. *See* La.R.S. 14:30.1(B) ("Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.").

The defendant appeals. By counseled brief, the defendant asserts that:

I.    The Trial Court erred in finding Major Jones guilty of second degree murder.

II.   The Trial Court erred in finding that a *Brady* violation did not occur.

The defendant also files a brief in proper person, alleging that: "His trial counsel rendered ineffective assistance when [he] failed to file [a] motion to quash the indictment on [the] basis of a fatal defect[.]"

**Discussion**

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920(2), this court reviews matters on appeal for errors "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." Following review, we note that the record does not demonstrate that the defendant was arraigned following the amendment of the bill of indictment. However, as the defendant proceeded to trial

4

without objection, any such error is waived.  *See* La.Code Crim.P. art. 555.[4]  We identify no additional errors patent.

*Sufficiency of the Evidence*

By his first assignment of error, defense counsel contends that the State failed to present sufficient evidence to prove the elements of second degree murder beyond a reasonable doubt.  Defense counsel specifically questions the element of specific intent and contends, instead, that "the trier of fact erred in finding [him] guilty of second degree murder instead of manslaughter as the record supports such a reduction."

An appellate court considers a defendant's challenge to the sufficiency of the State's pursuant to the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).  That standard requires the reviewing court to inquire as to whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier could have found the essential elements of the crime proven beyond a reasonable doubt.  *Id.*  Furthermore, in its application of *Jackson*, "a reviewing court is not permitted to second guess the rational credibility determinations of the fact finder at trial, nor is a reviewing court required to consider the rationality of the thought processes employed by a particular fact finder in reaching a verdict." *State v. Kelly*, 15-0484, p. 3 (La. 6/29/16), 195 So.3d 449, 451 (citing *State v. Marshall*, 04-3139 (La. 11/29/06), 943 So.2d 362, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007)).  "It is not the function of an appellate

---

[4] Louisiana Code of Criminal Procedure Article 555 provides, in part:  "A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty."

court to assess credibility or reweigh the evidence." *Id.* (citing *State v. Stowe*, 93-2020 (La. 4/12/94), 635 So.2d 168).

In pertinent part, La.R.S. 14:30.1 provides:

> A. Second degree murder is the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]

Louisiana Revised Statutes 14:10(1) defines "specific criminal intent" as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." The supreme court has explained that "[s]pecific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction." *State v. Broaden*, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362 (citing *State v. Maxie*, 93-2158 (La. 4/10/95), 653 So.2d 526), *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001). Further, specific intent "can be formed in an instant[.]" *State v. Cousan*, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390.

As pertinent to the defendant's claim regarding manslaughter, La.R.S. 14:31(A)(1) provides that:

> A. Manslaughter is:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

"The elements of 'sudden passion' and 'heat of blood' are mitigatory facts in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate." *State v. Deal*, 00-0434, p. 5

(La. 11/28/01), 802 So.2d 1254, 1260, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124 (2002).

Significantly, "[s]pecific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun." *State v. Riley*, 11-673, p. 11 (La.App. 5 Cir. 3/13/12), 90 So.3d 1144, 1150 (citing *State v. Knight*, 09-359 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, *writ denied*, 10-2444 (La.10/21/11), 73 So.3d 376), *writ denied*, 12-0855 (La. 9/28/12), 98 So.3d 828. It further may be "inferred from the extent and severity of the victim's injuries." *Id.* (citing *State v. Stacker*, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, *writ denied*, 03-0411 (La.10/10/03), 855 So.2d 327).

In asserting that the State failed to prove specific intent, the defense counsel suggested in its closing argument that the State left a "black hole" for the period after the defendant entered the home with no specific evidence regarding the circumstances surrounding the stabbing death. Counsel referenced Ms. Sepulvado's testimony wherein she explained that, on the car trip to Fisher, the defendant's demeanor was calm and that, while waiting on the defendant to return, she heard bumping noises coming from inside the home. Counsel contended that this testimony supported, at most, a finding of manslaughter when coupled with questioning during the defendant's interrogation wherein the investigator suggested that the defendant travelled to the home for sex and that Mr. Green could be aggressive in such circumstances. We address the defendant's claim of manslaughter below, first discussing his contention that the State filed to prove specific intent to kill to support the conviction for second degree murder.

Following review of the record in its entirety pursuant to the *Jackson* standard, we conclude that the jury's finding of specific intent is supported. We

first note the cause of death. Dr. Long Jin, qualified as an expert in forensic pathology, explained that the autopsy he performed on Mr. Green's body revealed that the victim died before the occurrence of the fire. Dr. Jin identified the cause of death as two stab wounds to the body, one to the heart, which came from the front, and one to the spleen. Dr. Jin explained that the autopsy further revealed multiple "defects, probably caused by the – the blunt force[.]" He explained that the latter defects were on Mr. Green's back and were consistent with having been hit with the claw part of a hammer. The record indicates that such a hammer was located on the floor of the kitchen, as was Mr. Green's body. As noted above, a factfinder may infer specific intent to kill by the intentional use of a weapon such as a knife or a gun. *See Riley*, 90 So.2d 144. Here, the defendant sustained two stab wounds and multiple "defects" supportive of such a finding as to that state of mind. *See* La.R.S. 14:10(1) ("Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act[.]" *See State v. Boyer*, 406 So.2d 143, 150 (La.1981) (wherein the supreme court concluded that the defendant's shooting of the victim in the head at close range permitted the inference that "he actively desired her death to follow his act.").

In addition to the jury's ability to infer specific intent from the nature of the inflicted wounds, the jury further heard of evidence supporting other circumstances indicative of that intent. Namely, the State presented evidence supporting a view that the defendant fled from the scene by taking Mr. Green's car, that he attempted to conceal the offense through the burning of both the home and the car, and that he thereafter attempted to avoid apprehension. In this latter regard, the jury heard recordings of the defendant's two interrogations with authorities in which he

8

denied, among other things, his presence at the house and his involvement in Mr. Green's death. Both interrogations were played for the jury. In *State v. Carmouche*, 12-1052 (La.App. 3 Cir. 4/3/13), 117 So.3d 136, a panel of this court observed that, in addition to the alleged close-range shooting of the victim in that case, the defendant's flight from the scene to avoid capture was a surrounding circumstance indicative of specific intent to kill. The panel's discussion included a passage from *State v. Davies*, 350 So.2d 586, 588 (La.1977), wherein the supreme court explained that "'[e]vidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt.'" *Carmouche*, 117 So.3d at 146.

Finally, and while the defendant suggests that the State's allegation of specific intent was inconsistent with Ms. Sepulvado's testimony regarding his calm demeanor prior to entering the home, it is important to recall that specific intent may be formed in an instant. *See Cousan*, 684 So.2d 382. Thus, the defendant's demeanor upon entering the home was not determinative of the jury ultimate conclusion as to specific intent. Finally, the record is silent as to the jury's credibility determinations related to Ms. Sepulvado's perception of the defendant's demeanor or her observations at the home.

Given those circumstances, we conclude that a rational trier of fact could have determined from the record evidence that the defendant inflicted the deadly wounds by stabbing in a manner consistent with specific intent to kill or inflict great bodily harm.

*Manslaughter*

We turn to the defendant's alternative argument that the evidence was supportive, at most, of a conviction for manslaughter due to the presence of mitigating factors of sudden passion or heat of blood. *See* La.R.S. 14:31(A)(1). In this regard, the defense counsel contends in brief to this court that the defendant "went to the residence to make some quick pocket money in exchange for sex[,]" and that "[i]t is highly likely" that he and Mr. Green "had a quarrel once Major was inside the residence" and that Mr. Green was killed as a result.

Certainly, as referenced above, when the factors of "sudden passion" and "heat of blood" are established by a preponderance of the evidence, a verdict of murder is inappropriate. *Deal*, 802 So.2d 1254. After review, we find that any rational trier of fact could have found that these mitigating factors were not proven. We above referenced the defendant's suggestion that the State's presentation of evidence left a "black hole" as to what occurred after he left the home and Ms. Sepulvado heard noises coming from the home. However, the record is similarly limited in that regard for purposes of establishing sudden passion or heat of blood. Significantly, the defendant did not testify as to the events in the home, nor did he offer any explanation as to his actions upon questioning by investigators. As noted by the defendant, Ms. Sepulvado testified that she heard a "boom" and "thump" from inside the home before receiving a call from the defendant telling her to leave the scene. She further explained that the defendant sounded frantic or scared. However, that testimony does not undermine the jury's conclusion that a reduction of the conviction to manslaughter was not warranted under the evidence presented. Instead, such limited evidence provided no context to any "provocation sufficient

to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1).

Accordingly, we leave the defendant's conviction undisturbed following review for sufficiency of the evidence.

*Alleged Exculpatory Evidence*

Defense counsel next argues that the trial court erred in failing to determine that the State failed to disclose alleged exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83. The defendant's initial argument on this point arose during the questioning of Detective Jack Staton of the Sabine Parish Sheriff's Department. Detective Staton's two recorded interrogations of the defendant were introduced into evidence and played for the jury at the time he was questioned. On cross examination, defense counsel inquired about Detective Staton's assertion to the defendant that he knew that Mr. Green was "pushy" and that they were aware of how he "operated." The following colloquy between defense counsel and Detective Staton provides:

> Q    Det. Staton, when you made that comment about, "We know he's pushy. We know how he operates…" who were you referring to?
>
> A    I was referring to Mr. Green.
>
> . . . .
>
> Q    When you – when you – before that, when you spoke about, "We not saying you killed him…" or something that effect, and then you paused and you said – you spoke about "heat of passion" and "doing things you don't mean to do" and all of that, what were you talking about?
>
> A    That was just a technique that I used to try to get to him to let him know that if he did do it, I understood him. By going along – you can do things through passion.
>
> Q    So you had –

11

A     We had – let me back up. He wasn't the first – I didn't want to get into all of this because that was personal, but we had d[one] a lot of investigation with individuals that w[ere] involved in this. We had a black book that we had interviewed people with, and it was spoken – the part about "knowing how he was aggressive" – he was and all that had been told to us by other people.

Q     How – how –

A     This is way -

. . . .

Q     How many?

A     Heck, I don't know? We had it in the notes. We had to go back over. We had a – we had a book. And I didn't feel like – I wasn't gonna get out and broadcast that. Yes, his personal life was his personal life. He – it was his. I was merely letting him know that we knew about the passion when I was telling him that through a heat of passion, maybe they got into a fight or whatever. We didn't know at that time.

Q     Okay.

A     And that's what I was trying to get.

In his motion for new trial and corresponding motion for post-verdict judgment of acquittal, the defendant suggested that by reference to a "book[,]" and to "notes," Detective Staton was referring to a book of investigative notes compiled by authorities. The defendant contended that such a book constituted undisclosed *Brady* material insofar as it had information from individuals who had personal knowledge of Mr. Green's purported aggressive nature. As it does here, the State argued in opposition that the only "book" referred to was Mr. Green's address book, an item listed in the return of the search warrant for Mr. Green's home. The State noted that the defendant had access to open file discovery.

Pursuant to the defendant's *Brady* argument, the trial court granted a motion for further testimony and conducted a hearing at which members of the

12

investigative team were called as witnesses. The trial court ultimately denied the defendant's motions for new trial and post-judgment verdict of acquittal. Following review, we maintain that ruling.

We first point out a defendant's claim pursuant to *Brady* includes three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1248 (1999). Generally, even in the presence of a discovery violation that involves the State's failure to disclose exculpatory evidence, a reversal is not required unless that "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.*, 527 U.S. at 281. *See also State v. Garrick*, 03-0137 (La. 4/14/04), 870 So.2d 990.

However, the defendant's argument fails upon consideration of the second component of the *Brady* claim. Simply, testimony does not reveal the existence of the type of compiled investigative notes on which the defendant bases his argument. First, the construction urged by the defendant requires a parsing of Detective Staton's testimony that is not readily plain. Additionally, the three of the members of the investigative team called to testify at the further contradictory hearing denied having knowledge of notes as described by the defense. Instead, each referred to the black address book collected from Mr. Green's home. The lead investigator, Detective Anthony Lowe, Jr., explained that he interviewed certain individuals in the address book, naming more significant contacts in his report. He denied having taken notes or that he was given notes by the team members. Detective Lowe pointedly responded "[a]bsolutely not" when asked

13

whether any type of notebook of notes was compiled. He further confirmed that the search warranted return listed the address book and that it had been stored with other evidence obtained.

Given Detective Staton's testimony at trial as well as the further testimony propagated pursuant to the post-verdict motions, we find no merit in the defendant's assertion that the trial court erred in rejecting his allegation of a *Brady* violation. Instead, the record supports the trial court's denial of both the motion for new trial and the motion for post-verdict judgment of acquittal.

This assignment lacks merit.

*Supplemental Brief*

The defendant has filed a brief in proper person alleging that his trial counsel was ineffective for failing to file a motion to quash the indictment. He contends the bill should have been quashed because it listed underlying offenses that should have not been included. Regarding ineffective assistance, this court has explained:

> A criminal defendant is guaranteed the effective assistance of counsel pursuant to U.S. Const. amend. VI and La. Const. art. 1, § 13. In pursuit of such a claim of ineffective assistance of counsel, a defendant must establish "(1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect." *State v. Leger*, 05-0011, p. 44 (La.7/10/06), 936 So.2d 108, 142-43 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *State v. Washington*, 491 So.2d 1337 (La.1986)), *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). However, a claim of ineffective assistance of counsel is typically more properly resolved by post-conviction proceedings as it allows the trial court to conduct a full evidentiary hearing, if warranted. *Id.* However, if the appellate record contains sufficient evidence to review the defendant's claim, the matter may be considered on appeal in the interest of judicial economy. *Id*.

*State v. Harris*, 13-133, pp. 5-6 (La.App. 3 Cir. 12/11/13), 156 So.3d 694, 699-700, *writ denied*, 14-0476 (La. 11/7/14), 152 So.3d 169.

14

In support of his argument, the defendant suggests that the underlying charges should not have been in the indictment as he was not arrested for those charges. We note that the record reveals only an arrest warrant for simple arson, a violation of La.R.S. 14:52. However, the warrant states that prior to the residential fire, the victim died "by homicide violence." The indictment initially charged the defendant with specific-intent second degree murder or felony-murder second degree murder with the underlying offenses listed as armed robbery, first degree robbery, second degree robbery, simple robbery, or aggravated assault. The amended indictment retained armed robbery and aggravated arson as underlying felonies.

On this point, we recognize that arrest is merely custodial and is not the basis of a defendant's subsequent trial and conviction. An arrest affidavit simply states a legal basis for taking person into custody. *See* La.Code Crim.P. arts. 201-203. Criminal proceedings are instituted and stated in an indictment. *See* La.Code Crim.P. arts. 381, 382, 383, 464. Further, a defendant may be indicted even after being discharged due to a preliminary examination or after a grand jury has previously refused to indict. *See* La.Code Crim.P. art. 386.

As the defendant notes, trial counsel filed a "Motion for Supplementary Discovery Concerning Offenses Listed on Bill of Indictment." Counsel specifically stated therein that he had been provided with routine discovery, but that said discovery did not include information regarding the underlying offenses charged in the initial indictment. Counsel further stated, "Neither has the defendant been arrested or charged for such offenses." As observed, however, the absence of arrest for those charges was not pertinent; further, the alleged deficiencies in the discovery materials were addressed in a hearing.

15

At the hearing conducted on the motion, the parties agreed to amend the indictment to eliminate first and second degree robbery and simple robbery charges. While that agreement appears to have resolved the discovery issues, the defendant contends in his brief to this court that the State lacked authority to amend the indictment. However, in *State v. Lafleur*, 13-1082, pp. 11-12 (La.App. 3 Cir. 3/5/14), 134 So.3d 167, 175, this court explained:

> In *State v. Williams*, 44,418, p. 8 (La.App. 2 Cir. 6/24/09), 15 So.3d 348, 353-54, *writ denied*, 09-1746 (La.3/26/10), 29 So.3d 1250, the second circuit addressed the State's authority to amend indictments, stating:
>
>> The prosecutor has the authority under La. C. Cr. P. art. 487 to make substantive amendments to an indictment at any time before the beginning of trial, subject to the defendant's right under La. C. Cr. P. art. 489 to move for a continuance if the amendment led to his prejudice. *State v. Crochet*, 05-0123 (La.6/23/06), 931 So.2d 1083. The purpose of a continuance is to protect defendant from surprise or prejudice which may result from such amendment. *State v. Cleveland,* 25,628 (La.App.2d Cir.1/19/94), 630 So.2d 1365. When the state requests an amendment to the bill of information before the first prospective juror is called, the defendant's remedy is a motion for continuance, not an objection to the amendment. *State v. Ignot*, 29,745 (La.App.2d Cir.8/24/97), 701 So.2d 1001, *writ denied*, 99-0336 (La.6/18/99), 745 So.2d 618.
>
> Accordingly, the defendant's remedy was to seek a continuance, not an objection to the amendment to the bill of information.

The defendant also argues the time limitations for commencement of trial expired. While he does not explain his argument further, the defendant cites La.Code Crim.P. art. 581. Reference to Article 581 indicates that it is part of the Criminal Code's chapter on limitations for commencing trial after the institution of prosecution. Yet, as previously noted, the initial indictment was filed on May 31,

16

2016. Since the trial commenced later that same year, the commencement of trial was well within the limits set by La.Code Crim.P. art. 578.[5]

Also, the defendant complains that he did not have a "72 hour hearing" on the charge of second degree murder. However, the lack of such a hearing, which addresses such issues as appointment of counsel and setting of bail, has no effect on later proceedings. *See* La.Code Crim.P. art. 230.1(D) (providing that "[t]he failure of the sheriff or law enforcement officer to comply with the requirements herein shall have no effect whatsoever upon the validity of the proceedings thereafter against the defendant.").

Next, the defendant asserts that the indictment did not inform him of the nature and cause of the case against him. Reference to the indictment reveals basic allegations informing the defendant that he was being charged with committing the specific-intent murder of James Paul Green on July 17, 2014 or the felony-murder of the same victim on the same date, with two possible underlying felonies listed. After considering the record, we find no indication that the defendant was not informed as to the nature of the proceedings against him.

Although he does not provide supporting argument or excerpts from the record, the defendant also suggests that the trial court's jury instructions

---

[5] Louisiana Code of Criminal Procedure Article 578 provides that:

    A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:

    (1) In capital cases after three years from the date of institution of the prosecution;

    (2) In other felony cases after two years from the date of institution of the prosecution[.]

improperly shifted the burden of proof to him. Following review, however, we find no merit to this unsupported argument.

Finally, at the close of his brief, the defendant reiterates his general claim that trial counsel should have filed a motion to quash due to defects in the bill of indictment. However, as discussed above, the defendant points to no actual defects in the bill. To the extent that the defendant repeatedly claims that trial counsel failed to properly investigate his case, such arguments are related to his arguments regarding discovery, a point addressed in the above *Brady* discussion. Accordingly, finding that the defendant has failed to demonstrate that counsel's performance was defective pursuant to *Strickland*, 466 U.S. 668, we conclude that the defendant's assignment lacks merit.

### DECREE

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**AFFIRMED.**